Filing # 23743343 E-Filed 02/13/2015 12:16:30 PM

## IN THE CIRCUIT COURT OF THE THIRTEEENTH JUDICIAL CIRCUIT
## IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

ROBERT C. NUCCI, an            Case No:_____
Individual and
XANDERWEE, LLC,

       Plaintiffs,

v.

BUCHANAN INGERSOLL &
ROONEY PC, a foreign corporation,

       Defendant.

_____/

### COMPLAINT

     Plaintiffs, Robert C. Nucci and Xanderwee, LLC, hereby sue Defendant, Buchanan

Ingersoll & Rooney PC, and for their Complaint alleges:

### JURISDICTION AND VENUE

    1.    Plaintiff, Robert C. Nucci ("**Dr. Nucci**"), is a resident of Hillsborough County,

Florida, is over 18 years of age, and is *sui juris*.

    2.    Plaintiff, Xanderwee, LLC ("**Xanderwee**") is a Florida Limited Liability Company

and transacts business in Hillsborough County, Florida.

    3.    Defendant, Buchanan Ingersoll & Rooney PC ("**Buchanan**"), is a professional

corporation organized under the laws of Pennsylvania and is registered to do business in the state

of Florida.  In Florida, Defendant Buchanan has offices in Broward County, Duval County, Lee

County, Leon County, Miami-Dade County, and Hillsborough County.  Defendant Buchanan is a

law firm that is regularly engaged in the practice of law.

    4.    Venue is proper under § 47.011, Florida Statutes, because:

      a.   the cause of action accrued within this judicial circuit; and

{10171/00388897.1}1

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE. 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

b. Defendant Buchanan conducts business in this judicial circuit.

5.  The damages incurred are in excess of $15,000, exclusive of interest, costs and attorneys' fees.

## GENERAL ALLEGATIONS

6.  Plaintiffs' claims arise from the failure of Defendant to properly perform its professional duties as attorneys for Plaintiffs.  As described more fully below, Defendant Buchanan failed to properly research , investigate and negotiate the terms of a transaction for the purchase by its clients, Dr. Nucci and Xanderwee of a controlling interest in the limited liability that then owned the Tampa Bay Storm (the "Storm"), an Arena Football League (the "**AFL**" or the "**League**") football team .

7.  Plaintiff Dr. Nucci is a board-certified, fellowship-trained orthopedic spine surgeon.  Dr. Nucci has practiced as an orthopedic spine surgeon in the Tampa Bay area for over 20 years, where he has built a successful medical practice.

8.  In 2007, Dr. Nucci -- and his practice -- was at a crossroads.  Dr. Nucci was finalizing his divorce from his wife of thirteen years (who also served as the medical practice's chief administrator), as well as looking for a new direction for his medical practice.  Specifically, Dr. Nucci felt the medical practice needed more exposure in the Tampa Bay area, and was interested in building revenue for his medical practice through such exposure.

9.  At the time, Dr. Nucci was leasing an apartment owned by Jay Mize, a former University of South Florida football player and local entrepreneur.  In approximately March, 2007, Mr. Mize and several of his business partners asked Dr. Nucci if he would be interested in observing a presentation on a potential investment opportunity.  Dr. Nucci agreed, and in late March, 2007, the group presented him with information regarding the Storm, an AFL team.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

10.     After the meeting, Dr. Nucci attended two Storm home games, and began contemplating whether an investment in the team would provide the added exposure Dr. Nucci felt was needed for his medical practice.

11.     In addition, Dr. Nucci contacted Larry Carr, a representative of Peter "Woody" Kern, who was a principal of Pigskin, LLC (**"Pigskin"**), the Storm's then owner.  Mr. Carr represented that the Storm, or a stake therein, was available for purchase.

12.     Dr. Nucci contacted James Kennedy, a partner from Buchanan's Tampa office, who had been previously retained by Dr. Nucci to provide counsel relating to Dr. Nucci's medical practice.  Mr. Kennedy represented that Buchanan was general counsel for the Pittsburgh Steelers , a national football league football team and several other sports teams, had extensive knowledge in sports team acquisitions, and therefore the requisite skill and expertise in the research and negotiation of transactions relating to acquisitions of professional sports teams, including an AFL team.

13.     On or about March 20, 2007, Dr. Nucci retained Defendant to represent him with regard to the opportunity to participate in the investment group seeking to acquire the Storm.

14.     Later, Mr. Kennedy introduced Dr. Nucci to Linda Fleming, another partner in Buchanan's Tampa office. Mr. Kennedy represented that Ms. Fleming was skilled in "transactions like this."

15.     On March 26, 2007, Dr. Nucci advised the investment group to contact Mr. Kennedy, as his attorneys.  Upon information and belief, a telephone call subsequently occurred between the investment group and Ms. Fleming.

16.     On April 6, 2007, Mr. Kennedy, acting on Dr. Nucci's behalf, terminated the written agreement that had been executed between Dr. Nucci and the investment group.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

17.    In or around June 2007, Mr. Carr contacted Dr. Nucci again to find out if Dr. Nucci was still interested in purchasing the Storm.  During the conversation, Dr. Nucci expressed interest in purchasing the team (on an independent basis from the investment group), and the two decided that an in-person meeting would be beneficial.

18.    In or around August 2007, Dr. Nucci and Mr. Carr met in New York and Dr. Nucci visited the AFL headquarters for a "tour."  During the meeting, Dr. Nucci and Mr. Carr discussed the terms of a potential acquisition of Pigskin, the then owner of the Storm, including payment terms.  The payment terms contemplated that the price for purchase of the team would be $18,875,000 paid over several years, with corresponding ownership interests being conveyed at each closing.  The parties contemplated that the initial payments sufficient to convey a majority interest would consist of a $300,000 deposit ("**Deposit**") and a separate $9,626,500 payment ("**First Payment**").  As described in more detail below, two additional payments to be made over time would result in the conveyance of the remainder of the ownership of Pigskin, LLC.

19.    In due course, Dr. Nucci formed Xanderwee to serve as the vehicle to hold the ownership rights in Pigskin which were being acquired.

20.    While Dr. Nucci had approximately $6 million of his own funds available to fund the First Payment in part, Dr. Nucci needed to secure financing for the remaining $3.6 million of the First Payment.

21.    Dr. Nucci secured two loans for a total of $3,620,000, utilizing the real property owned by his medical practice and other real property owned by Dr. Nucci as collateral.  The first loan was for $2,320,000 and the second loan was for $1,300,000.

22.    At the same time that Dr. Nucci was taking steps to secure this financing, Mr. Carr sent Dr. Nucci the first draft agreement for purchase of the Storm in August 2007.

{10171/00388897.1}4

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

02/13/2015 12:16 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 4

23.     Shortly thereafter, at a meeting between Dr. Nucci and Mr. Kennedy, Dr. Nucci expressed to Mr. Kennedy that he was still interested in purchasing the Storm, and that he needed to secure legal advice with regard to the purchase of the interest in Pigskin and the negotiation of the transaction documents.  Dr. Nucci made it clear that he had no knowledge of what would be entailed in the acquisition, and needed an experienced attorney in sports team acquisitions to research and analyze the potential deal before he went any further.  At the time, Dr. Nucci requested a recommendation and specifically stated, "I don't know what I don't know."

24.     In response to Dr. Nucci's comments, Mr. Kennedy represented that Buchanan would be able to provide the legal counsel necessary for the acquisition of Pigskin.

25.     Dr. Nucci advised Mr. Kennedy that he trusted Buchanan and that if Mr. Kennedy felt that Buchanan would be able to provide the services Dr. Nucci required, that he would prefer to hire Buchanan rather than seek out a new firm to work with.

26.     Mr. Kennedy once more assured Dr. Nucci that Buchanan had significant expertise in the area and could serve as Dr. Nucci's (and Xanderwee's) attorneys in the acquisition. Mr. Kennedy stated that Ms. Fleming would serve as the point person on the transaction and reminded Dr. Nucci of her experience in the area.

27.     As a result, Dr. Nucci engaged Buchanan to provide business and legal counsel, advice, and representation with respect to the purchase of an interest in Pigskin and the Storm. Once Xanderwee, was formed on October 5, 2007, to serve as the acquiring entity for Dr. Nucci's interest, Buchanan's role included service as Xanderwee's attorneys as well.

28.     There were no limitations placed on the engagement by Dr. Nucci or Xanderwee. Indeed, Ms. Fleming has testified, *inter alia*, that her role included "finding any skeletons in the

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

closet" and that she conducted a limited amount of internet research concerning the AFL. That research and the information contained therein was not shared with Dr. Nucci or Xanderwee.

29.     Despite Buchanan's engagement and their corresponding duty to provide competent counsel, advice, and representation with regard to a potential purchase of an interest in the Storm, Buchanan failed to undertake the requisite due diligence regarding the transaction.

30.     Specifically, Buchanan failed to conduct necessary due diligence concerning the AFL and/or recommend that others perform such due diligence. Importantly, the structure of the AFL was such that each team owned a percentage of the League and thus, if one owned a team, that owner also owned a portion of the League itself.

31.     Accordingly, limited, if any, information was provided to Dr. Nucci and Xanderwee concerning the nature of the AFL's finances and financial condition. Because Buchanan failed to perform any analysis of the financial condition of the AFL, recommend that others conduct such an analysis or obtain the documents in due diligence necessary to perform any such analysis, Buchanan failed to ascertain that the AFL's economic model was unsustainable, and was at risk of failure.

32.     Most notably, Buchanan never engaged in meaningful due diligence which would have revealed that the AFL was operating under a flawed economic model and was struggling to stay afloat. Correspondingly, Buchanan's clients, Dr. Nucci and Xanderwee, were never advised of this economic model or the risks associated with it.

33.     Had Buchanan performed such due diligence, the requisite research would have exposed the fact that he AFL had, for several seasons, been budgeting revenue that was never realized, and could not be realized due to the fact that the AFL's sponsorships and broadcast revenue could not cover its deficits. As a result, the AFL relied on capital contributions, bank debt,

{10171/00388897.1}6

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

02/13/2015 12:16 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 6

or expansion revenue to fund its yearly deficits. Without an expansion each year, the League would need an equity investment to pay the substantial bank debt its operations had incurred each season. As due diligence would also have revealed, the AFL was concerned about expansion revenue drying up, as expansion revenue was the lifeblood of the AFL.

34.   Additionally, Buchanan failed to advise Dr. Nucci and Xanderwee – due to its failure to perform adequate due diligence – that the AFL was severely undercapitalized and understaffed. The only cash infusion to the League each year came from the sale of new teams. Furthermore, the AFL's significant bank debt was not being used to fund growth or expansion of the AFL into new markets, but rather to fund its current operations.

35.   Unaware of these detriments due to Buchanan's failure to research or advise Dr. Nucci and Xanderwee with regard to the AFL's finances, Dr. Nucci and Xanderwee proceeded with purchasing an interest in the Storm from Pigskin under the terms of the Membership Interest Purchase Agreement ("MIPA"), executed by Xanderwee, Dr. Nucci and Mr. Kern on November 30, 2007.

36.   As noted above, the MIPA was structured to transfer all of Pigskin's (the corporate entity owned by Mr. Kern which held title to the Storm) membership interests to Xanderwee in three separate transactions.

37.   At the first closing, which occurred on November 30, 2007, Mr. Kern, in consideration of Xanderwee's payment of the $9,626,250 First Payment transferred all right, title and interest in 510 units, or 51%, of Pigskin.

38.   The second and third closings were scheduled to occur on July 15, 2010, and July 15, 2011, respectively.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

39.     At the second closing, Mr. Kern, in consideration of a payment by Xanderwee of $8,305,000, would be obligated to transfer to Xanderwee all right, title and interest in and to an additional 440 Units, or 44%, of Pigskin.

40.     At the third closing, Mr. Kern, in consideration of Xanderwee's final payment of $943,750.00, was obligated to transfer to Xanderwee all right, title and interest in the remaining 50 Units, or 5%, of Pigskin.

41.     Certificates representing these blocks of transferred units were to be delivered by Mr. Kern to Xanderwee at each of the three closings.

42.     Importantly, Buchanan did not negotiate for nor were any representations, warranties or conditions precedent contained within the MPIA with regard to: (a) any issues concerning AFL finances; (b) any requirement that the Storm actually play for a specified number of AFL seasons such that the failure to satisfy such conditions would have resulted in a rescission of the transaction or otherwise make Dr. Nucci and Xanderwee whole.

43.     After investing more than $9.9 million (by paying the Deposit and the First Payment) to acquire a majority interest (51%) in Pigskin, Dr. Nucci and Xanderwee were required to invest additional funds into the Storm in order to operate throughout the 2008 season.

44.     The Storm lost over $2 million in Xanderwee's first year of ownership, largely as a result of operating expenses and advertising costs.

45.     After the 2008 AFL season, Dr. Nucci attended an AFL meeting in New Orleans, Louisiana with other AFL owners and management. At the July 2008 meeting, Dr. Nucci learned for the first time that the AFL had completely or almost completely drawn down a $10 million line of credit issued to the AFL by Fifth Third Bank in order to keep operating and, without an infusion

{10171/00388897.1}8

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

02/13/2015 12:16 PM Electronically Filed: Hillsborough County/13th Judicial Circuit Page 8

of new money, would run out of money and soon cease operations. In addition, after the meeting, AFL Commissioner David Baker resigned.

46.      Unbeknownst to Dr. Nucci and Xanderwee, an agreement signed by Mr. Kern on behalf of Pigskin obligated Pigskin directly to Fifth Third Bank for the AFL line of credit. Accordingly, as a majority owner of Pigskin, Xanderwee was now obligated to Fifth Third Bank for the loan that had been made to the AFL—yet another repercussion of the transaction that Buchanan had failed to properly research and advise Dr. Nucci and Xanderwee.

47.      Had Dr. Nucci and/or Xanderwee been aware that the line of credit had been substantially drawn down to fund operations, which obligation Xanderwee would be obligated to repay, Xanderwee would not have entered into the MIPA or any agreement to purchase an interest in the Storm.

48.      After its line of credit had been drawn down, the AFL continued in its efforts to find an outside investor to fund the League. Ultimately, these efforts were unsuccessful.

49.      Approximately one year after the MIPA was signed and Xanderwee purchased a majority interest in Pigskin, the AFL voted to suspend play throughout the entire league and cancel the 2009 season.

50.      As a result of this suspension, Dr. Nucci and Xanderwee were not able to realize any return on the investment. Dr. Nucci was additionally harmed because the suspension meant that the Storm could not be used to market and promote Dr. Nucci's medical practice in the Tampa Bay community—the entire reason that Dr. Nucci had invested in the team to begin with.

51.      This loss of investment greatly harmed Dr. Nucci's medical practice, and led to a marked decline in the number of new patients that were brought into the practice, as many of these

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

patients had initially been introduced to Dr. Nucci's practice based upon his involvement with the Storm.

52.     In September 2009, the AFL filed for Chapter 11 bankruptcy, which ultimately extinguished Pigskin's ownership in the AFL and its ownership of the Storm. During the bankruptcy proceedings, a significant amount of Dr. Nucci's time and resources were devoted to the ongoing court proceedings associated with the Storm bankruptcy. The time and resources required to deal with the bankruptcy correspondingly diminished the time Dr. Nucci was able to devote to his medical practice, in turn producing additional losses as a result of Dr. Nucci's involvement with the Storm.

53.     At the same time, Dr. Nucci was still obligated to pay tens of thousands of dollars per month under the terms of the $3.6 million loan Dr. Nucci had taken out in order to fund the First Payment to Mr. Kern under the MIPA.

54.     Despite the fact that Dr. Nucci's practice was suffering as a result of the bankruptcy and ongoing problems with the Storm team, he continued to pay $60,000 - $70,000 on the $3.6 million loan until the summer months of 2013 when he could no longer do so. Dr. Nucci tried to negotiate the payments down based on the loss of revenue at his medical practice, but could not reach an agreement with the bank.

55.     The bank subsequently initiated litigation against Dr. Nucci for nonpayment of the loans. When Xanderwee did not pay the second and third installments under the MIPA, Mr. Kern initiated litigation against Xanderwee and Dr. Nucci.

56.     Once more, the time and resources required to deal with this litigation detracted from Dr. Nucci's ability to devote time to sustaining and growing his medical practice and related

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

businesses. The medical practice and related businesses suffered. These losses would not have occurred had Dr. Nucci and Xanderwee been properly represented by Buchanan.

57.    Ultimately, on September 2, 2010, Dr. Nucci was forced to file personal bankruptcy, which would not have occurred had Buchanan performed proper legal services in the transaction.

58.    In or around December 2013, a receiver was appointed to oversee Dr. Nucci's medical practice and related medical businesses, which had guaranteed the loans taken to fund the First Payment.

59.    All conditions precedent to the maintenance of this Action have been satisfied, waived or are excused as futile.

60.    To the extent that the claims asserted herein may otherwise be barred by the expiration of a statute of limitations, Plaintiffs and Defendant have executed a series of annual tolling agreements that have extended any otherwise applicable statute of limitations such that the claims asserted herein are timely.

### COUNT I – PROFESSIONAL MALPRACTICE

61.    Plaintiffs re-allege and incorporate paragraphs 1 through 60 as if fully set forth herein.

62.    Plaintiffs engaged Defendant Buchanan to provide business and legal counsel, advice, and representation with respect to Plaintiffs' purchase of an interest in the Storm arena football team, by and through the acquisition of Pigskin.

63.    Defendant Buchanan owed a fiduciary duty to Dr. Nucci and Xanderwee to exercise a standard of care that similarly situated attorneys in the community would be expected to provide in representing Plaintiffs' interests in the acquisition.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

64.     Defendant Buchanan breached its duties to Plaintiffs and fell beneath the requisite standard of care by failing to conduct appropriate due diligence with regard to the transaction (including but not limited to due diligence on the finances and continued viability of the AFL), disclose such information and the potential risks of proceeding with the transaction, and, in general, failing to provide diligent representation to Dr. Nucci and Xanderwee.

65.     Had proper due diligence been conducted by Buchanan such that the true state of the AFL's finances and the Pigskin guarantee of AFL debt had been disclosed to Dr. Nucci and Xanderwee, Dr. Nucci and Xanderwee would not have closed on the transaction, would not have made the First Payment and would not have incurred any of the other fees and expenses arising out of the confluence of events that subsequently transpired.

66.     Defendant Buchanan further breached its fiduciary duty by failing to negotiate for or include within the transaction documents: (a) sufficient representations, warranties and/or conditions precedent concerning the AFL's financial condition and the continued viability of the AF; (b) a requirement that the Storm play (under Xanderwee's ownership of Pigskin) for a sufficient minimum number of seasons to protect the Plaintiffs' investment such that if the same did not come to pass, Dr. Nucci and Xanderwee would not be financially harmed.

67.     As a direct and proximate result of Defendant Buchanan's breaches of the requisite standard of care, Plaintiffs have been damaged in an amount in excess of $15,000,000.  This amount includes, but is not limited to the following damages: (a)  the $9,626,250 First Payment on the Pigskin acquisition;  (b)  the funds necessary to fund the Storm subsequent to Xanderwee's acquisition of a majority interest in Pigskin;  (c)  legal fees and expenses associated with the AFL Bankruptcy proceedings;  (d)  interest paid  on the loans taken to fund the First Payment;  (e)  legal fees and expenses relating to litigation arising from nonpayment of the loans taken to fund the First

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

Payment; (f) legal fees and expenses arising out of the litigation with Mr. Kern and related entities; (g) legal fees and expenses arising out of Dr. Nucci's personal bankruptcy and (h) damages, including lost profits, relating lost business that would otherwise be reasonably expected of Dr. Nucci's medical practices and related businesses in an amount to be determined by an appropriate expert.

WHEREFORE, Plaintiff, Robert C. Nucci and Xanderwee, LLC, demand that judgment be entered in their favor and against Defendant, Buchanan Ingersoll & Rooney PC, for compensatory damages, prejudgment interest, costs, and all such other or additional relief as this Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated this 13th day of February, 2015.

HALL, LAMB AND HALL, P.A.
*Attorney for Plaintiffs*
2665 South Bayshore Drive, PH-1
Miami, FL 33132
Telephone: (305) 374-5030
Facsimile:   (305) 374-5033
Email: adamhall@hlhlawfirm.com
          Pleadings@hlhlawfirm.com

By: /s/ Adam S. Hall
          ADAM S. HALL
          Fla. Bar. No.: 109983

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033