UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT C. NUCCI, an Individual and
XANDERWEE, LLC,                                    CASE NO.: 8:15-cv-00518-EAK-AEP

      Plaintiffs,

vs.

BUCHANAN INGERSOLL & ROONEY
PC, a foreign corporation,

      Defendant.
_____/

## DEFENDANT'S ANSWER WITH AFFIRMATIVE DEFENSES

Defendant BUCHANAN INGERSOLL & ROONEY PC ("Buchanan"), pursuant to Federal Rules of Civil Procedure 12 and 81, files its Answer with Affirmative Defenses to the Plaintiffs' Complaint as follows with regard to each respective paragraph of the Complaint:

### JURISDICTION AND VENUE

1.      The Defendant admits Paragraph 1 of the Complaint.

2.      The Defendant is without knowledge of Paragraph 2 of the Complaint; therefore denied.

3.      The Defendant admits Paragraph 3 of the Complaint for jurisdictional purposes only. Otherwise the allegations are denied.

4.      The Defendant admits venue is proper in this Court.

5.      The Defendant admits that Plaintiffs claim to have incurred damages in excess of $15,000.  Otherwise the allegations are denied.

### GENERAL ALLEGATIONS

6.      The Defendant denies Paragraph 6 of the Complaint.

7.     The Defendant admits that Dr. Robert Nucci ("Nucci") is an orthopedic spine surgeon practicing in the Tampa Bay area.  Defendant is without knowledge of Nucci's certifications or training, and the word "successful" is vague and subject to interpretation; therefore Defendant denies the portions of Paragraph 7 related to Nucci's credentials and the allegation that he built a "successful" medical practice.

8.     The Defendant admits that, in 2007, Nucci was involved in contentious divorce litigation with his wife.  The Defendant is without knowledge regarding the remaining allegations of Paragraph 8 of the Complaint and therefore they are denied.

9.     The Defendant admits that in March 2007, Storm Football Partners ("SFP"), provided Nucci financial information for the Tampa Bay Storm ("Storm") and the Arena Football League ("AFL"), conditioned upon Nucci's execution of a Confidentiality, Non-Disclosure and Non-Circumvention Agreement ("Non-Circumvention Agreement").  The Defendant is without knowledge regarding the remaining allegations of Paragraph 9 of the Complaint and therefore they are denied.

10.    The Defendant is without knowledge of Paragraph 10 of the Complaint; therefore denied.

11.    The Defendant admits that, based upon the information provided by SFP, Nucci was interested in buying the Storm and communicated to Larry Carr ("Carr") his interest in purchasing the Storm.

12.    The Defendant admits Paragraph 12 of the Complaint to the extent that Nucci contacted James Kennedy ("Kennedy") regarding the Storm.  The remaining allegations of Paragraph 12 are denied.

13.    The Defendant denies Paragraph 13 of the Complaint as phrased.

14.     The Defendant admits Paragraph 14 of the Complaint to the extent that Nucci was introduced to Linda Fleming ("Fleming") by Kennedy.  The remaining allegations of Paragraph 14 are denied.

15.     The Defendant is without knowledge of Paragraph 15 of the Complaint; therefore denied.

16.     The Defendant admits that, at Nucci's direction, Kennedy sent a letter on behalf of Nucci terminating the written agreement between Nucci and SFP.  By way of further answer, despite being advised of the risk of terminating the Non-Circumvention Agreement to proceed on his own, Nucci insisted on pressing forward, was ultimately sued by his partners for breaching the agreement and lost a multi-million dollar judgment.

17.     The Defendant is without knowledge as to how the contact took place as alleged in Paragraph 17, but admits that Nucci wanted to purchase the team on his own without involvement by SFP, notwithstanding the terms of the Non-Circumvention Agreement.  The Defendant is without knowledge regarding the remaining allegations of Paragraph 17 of the Complaint and therefore they are denied.

18.     The Defendant admits in or around August 2007, Nucci and Carr met in New York and Nucci visited the AFL Headquarters.  This was one of many communications that occurred between Nucci and the AFL as Nucci contemplated buying the Storm in which Buchanan played no role. The Defendant is without knowledge regarding the remaining allegations of Paragraph 18 of the Complaint and therefore they are denied.

19.     The Defendant admits that, on or about October 5, 2007, Nucci – without the assistance of the Buchanan attorneys – formed  Xanderwee, LLC ("Xanderwee"), as the vehicle to hold the rights in Pigskin, LLC ("Pigskin").

20.     The Defendant is without knowledge of Paragraph 20 of the Complaint, as Nucci utilized his financial planner and his attorney Paul Genet ("Genet") – rather than Buchanan – to facilitate the funding for the purchase of the Storm; therefore, denied.

21.     The Defendant is without knowledge of the allegations of Paragraph 21, therefore, denied.

22.     The Defendant is without knowledge of Paragraph 22 of the Complaint; therefore denied.

23.     The Defendant admits Paragraph 23 of the Complaint to the extent that Nucci told Kennedy that he wanted to purchase the Storm and he wanted Buchanan to draft documents to effectuate his purchase of the team.  Otherwise, the remaining allegations of Paragraph 23 are denied.

24.     The Defendant denies Paragraph 24 of the Complaint as phrased, but admits that Buchanan agreed to review and draft legal documents associated with the purchase of the team by Nucci and Xanderwee.  Nucci's personal counsel Genet and CPA Michael Bollenback ("Bollenback") were involved in reviewing and providing counsel regarding the legal, business, financial, and tax aspects of the transaction.

25.     The Defendant denies Paragraph 25 of the Complaint as phrased.

26.     The Defendant denies Paragraph 26 of the Complaint.

27.     The Defendant admits that Buchanan agreed to review and draft legal documents associated with the purchase of the team by Nucci and Xanderwee.  The Defendant denies Buchanan was engaged to review and advise Plaintiffs on the other legal, business, financial, and tax aspects of the transaction.  Otherwise, the remaining allegations of Paragraph 27 are denied.

28.     While the quotation of an excerpt of Fleming's testimony in the Bankruptcy adversary proceeding is an accurate quotation, it is taken out of context.  The Defendant denies Paragraph 28 of the Complaint.

29.     The Defendant denies Paragraph 29 of the Complaint.

30.     The Defendant denies Paragraph 30 of the Complaint.

31.     The Defendant denies Paragraph 31 of the Complaint.

32.     The Defendant denies Paragraph 32 of the Complaint.

33.     The Defendant denies Paragraph 33 of the Complaint.

34.     The Defendant denies Paragraph 34 of the Complaint.

35.     The Defendant denies Paragraph 35 of the Complaint.

36.     The Membership Interest Purchase Agreement ("MIPA") speaks for itself; otherwise, the allegations of Paragraph 36 are denied.

37.     The Defendant denies Paragraph 37 of the Complaint.  The Defendant is without knowledge of the person or entity that paid the First Payment to Peter "Woody" Kern ("Kern"); however, upon information and belief, a $300,000 non-refundable deposit was paid to Kern on or about August 31, 2007, before Plaintiffs were allowed to conduct due diligence, and $9,339,000 was paid to Kern on October 12, 2007, more than a month before the November 30, 2007 closing.

38.     The MIPA speaks for itself; otherwise, the allegations of Paragraph 38 are denied.

39.     The MIPA speaks for itself; otherwise, the allegations of Paragraph 39 are denied. By way of further answer, the second closing never occurred and, by court order, Nucci was excused from paying Kern the balance of the purchase price due under the MIPA because the Court found that Kern materially breached the MIPA by failing to disclose Pigskin's contingent

liability as to the AFL's $10 million line of credit which should have been included on the Storm's financial statements.

40.     The MIPA speaks for itself; otherwise, the allegations of Paragraph 40 are denied. By way of further answer, the third closing never occurred and, by court order, Nucci was excused from paying Kern the balance of the purchase price due under the MIPA because the Court found that Kern materially breached the MIPA by failing to disclose Pigskin's contingent liability as to the AFL's $10 million line of credit which should have been included on the Storm's financial statements.

41.     The MIPA speaks for itself; otherwise, Defendant denies Paragraph 41 of the Complaint.

42.     The Defendant denies Paragraph 42 of the Complaint.

43.     The Defendant is without knowledge whether Nucci and Xanderwee were required – as their predecessor had been – to invest funds into the Storm; therefore denied.

44.     The Defendant is without knowledge of financial losses incurred by the Storm during Xanderwee's first year of ownership; therefore denied.  By way of further answer, it was reported that Nucci installed Genet, a personal injury attorney, as General Counsel to the team and Nucci's cousin, a former used-car dealer, as Chief Operating Officer and President.

45.     The Defendant is without knowledge of Paragraph 45 of the Complaint; therefore denied. By way of further answer, by that point in time, Nucci had been sitting on the AFL's Board of Directors for over 6 months.

46.     The Defendant denies Paragraph 46 of the Complaint.

47.     The Defendant denies Paragraph 47 of the Complaint.

48.     The Defendant is without knowledge of Paragraph 48 of the Complaint; therefore denied.

49.     The Defendant is without knowledge of Paragraph 49 of the Complaint; therefore denied.

50.     The Defendant denies Paragraph 50 of the Complaint.

51.     The Defendant denies Paragraph 51 of the Complaint.

52.     Admit that in September 2009, the AFL filed for Chapter 11 bankruptcy.  The remaining allegations of Paragraph 52 are denied.

53.     The Defendant is without knowledge of Paragraph 53 of the Complaint; therefore denied.

54.     The Defendant is without knowledge of Paragraph 54 of the Complaint; therefore denied.

55.     Admit the bank initiated litigation against Nucci for nonpayment of the loans, but the remaining allegations of Paragraph 55 are denied as phrased.

56.     The Defendant denies Paragraph 56 of the Complaint.

57.     Admit Nucci filed a Chapter 11 Bankruptcy action, Case No.: 8:10-bk-21419, on or about September 2, 2010.  The remaining allegations of Paragraph 57 are denied.

58.     The Defendant is without knowledge of Paragraph 58 of the Complaint; therefore denied.

59.     The Defendant is without knowledge of Paragraph 59 of the Complaint; therefore denied and strict proof thereof is demanded.

60.     The Defendant admits that Defendant and Plaintiffs have entered into certain tolling agreements.  Otherwise the remaining allegations of Paragraph 60 are denied.

CASE NO.:  8:15-cv-00518-EAK-AEP

## COUNT I – PROFESSIONAL MALPRACTICE

61.     The Defendant restates its responses to Paragraphs 1-60 as if fully set forth herein.

62.     The Defendant denies Paragraph 62 of the Complaint.

63.     The Defendant denies Paragraph 63 of the Complaint.  Additionally, Defendant has filed a Motion to Strike the term "a fiduciary duty".

64.     The Defendant denies Paragraph 64 of the Complaint.

65.     The Defendant denies Paragraph 65 of the Complaint.

66.     The Defendant denies Paragraph 66 of the Complaint.  Additionally, Defendant has filed a Motion to Strike the term "a fiduciary duty".

67.     The Defendant denies Paragraph 67 of the Complaint.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.     As a First Affirmative Defense, the Defendant states that the Plaintiffs were negligent through their own conduct and that such negligence was the sole, proximate or contributing cause of the damages complained of.  Their recovery, if any, should be barred or reduced proportionately pursuant to the doctrine of comparative negligence.  Nucci is a sophisticated businessman and retained an extensive team of professionals who, along with Nucci, researched, investigated, and negotiated (often without the knowledge, input, or counsel of Buchanan) the terms of Plaintiffs' purchase of a controlling interest in Pigskin, which owned the Storm in 2007.  For instance:

    a.  Nucci initially entered into the Non-Circumvention Agreement with SFP to receive information on the Storm and to pursue the purchase of the team with his partners without first informing Buchanan;

    b.  In the Non-Circumvention Agreement, Nucci promised not to attempt to buy the Storm independent of his partners, but shortly after making that promise and receiving information on the Storm compiled by his partners, Nucci

breached the Agreement and proceeded without his partners who successfully sued Nucci and obtained a multi-million dollar judgment against him.

c.   Nucci himself negotiated the terms of the agreement to purchase the Storm, and met with, communicated directly with, and received presentations and information from the AFL, including attending multiple meetings with AFL executives and owners in New York and Chicago to discuss the league and its requirements related to Nucci's purchase of the Storm;

d.   Nucci engaged his personal counsel, Genet (who later became the Storm's general counsel), to accompany him at meetings related to the due diligence investigation and contract negotiations for the purchase, to serve as a conduit between the parties and their respective business and legal teams for purposes of gathering and sharing information related to the transaction, and to provide legal and business counsel to Nucci;

e.   Nucci hired a certified public accountant, Bollenback – whose accounting firm provides litigation support and business valuation services – to vet the financial and tax aspects of the transaction.  Bollenback reviewed and analyzed financial information received during due diligence and reported findings to Nucci;

f.   Nucci utilized his own personal financial advisor to facilitate the funding of his purchase of the Storm;

g.   Nucci engaged his corporate attorney to form Xanderwee and relied on advisors other than Buchanan in obtaining loans from Regions Bank allegedly used to pay a portion of the purchase price;

h.   One of the motivations behind Nucci's multi-million dollar purchase of the Storm was to decrease his liquid assets in the divorce.  The woman who Nucci was dating at the time of the Storm transaction testified in the Bankruptcy adversary proceeding that Nucci said his purpose behind purchasing the team was to shock his wife and her attorneys so that when they asked him where all the money went, he could respond he bought a football team;

i.   Nucci or Xanderwee spontaneously and with no legal obligation to do so, unilaterally decided to pay Kern $9,339,000 of the purchase price for 51% of Pigskin on October 12, 2007, while the parties were still negotiating the form of the MIPA, without even advising the Buchanan attorneys that he had done so.  Nucci was so anxious to purchase the Storm that payment was made to Kern during the due diligence period, before Plaintiffs were legally bound to purchase the Storm at closing on November 30, 2007.  Based on information and belief, Genet knew that payment had been made to Kern even though Genet's advice to Nucci in the transaction was "Go slow.  Be careful.";

      j.    Prior to purchasing the Storm, Nucci was aware that the Storm regularly lost money and that Kern, the owner of the Storm, incurred tax losses between $600,000 to $1,100,000 per year and contributed personal funds for operating expenses between $350,00 to $900,000 per year from 2003 to 2006;

      k.    Prior to Nucci and Xanderwee signing the MIPA to acquire the Storm, they received from the AFL an Operations Report that disclosed the total revenues and expenses for every team in the AFL for 2007 which disclosed that the average team losses in 2007 were $1.7 million and that combined team losses were expected to be $30,052,869 in 2007;

      l.    Nucci's motivation to purchase the Storm was not to make money but instead to reduce liquid assets during his divorce proceeding, incur losses to set off gains from his other business ventures, and use the Storm as a marketing platform for his medical practice.

      2.    As a Second Affirmative Defense, the Defendant states that the conditions and damages complained of in the Complaint were caused by the acts and conduct of others not named as Defendants in this action, including but not limited to:  Genet, Bollenback, Kern, and Carr.  In fact, in other proceedings, Nucci has sued Kern, Carr, Baker, and Storm Head Coach Marcum for fraud in the inducement and negligent misrepresentation, and sued individual members of the AFL's Board of Directors for fraudulent concealment of the Leagues' finances and negligence.

      Genet – Nucci's personal counsel – was a main conduit of the transaction, and he and Nucci were the only individuals who had direct contact with the AFL throughout the transaction.  At the urging of Kern – in or around August 2007, Nucci and Carr met with AFL executives in New York to discuss the AFL's finances and Nucci's potential purchase of the Storm.  Upon information and belief, during that trip, Nucci, Genet, and Carr worked out the business terms for Nucci's purchase of the Storm on a cocktail napkin at dinner. Upon information and belief, Nucci and Genet attended other highly confidential meetings with AFL

executives, at which time they were advised of and received presentations and information about the AFL's finances and economic model, which was available only to AFL team owners and their agents. Nucci instructed the Buchanan attorneys not to attend these meetings, and neither Nucci nor Genet provided to Buchanan's attorneys the AFL financial information they received at those meetings, which was not available from any other source. Genet failed to conduct appropriate due diligence of the AFL and failed to provide Nucci with appropriate advice based on the information that he obtained from meetings he participated in with Kern, Carr, and the AFL. Nucci has filed a claim against Genet in bankruptcy and entered into a tolling agreement with Genet to preserve a future claim.

Nucci retained Bollenback, an accountant, to conduct financial due diligence and advise him about the financial, business, and tax aspects of the transaction. Bollenback failed to conduct appropriate due diligence of the AFL and failed to advise Nucci concerning the AFL's financial condition.

Nucci has alleged, in various other proceedings, that the conditions and damages complained of in the Complaint were caused by the acts and conduct of Kern, Carr, the AFL, AFL executives, and multiple AFL team owners. Specifically, Nucci – through his business entities Pigskin and Xanderwee – sued Kern, Carr, the AFL, AFL executives and multiple AFL team owners in *Pigskin v. Kern*, Case No. 10-CA-13285, in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida (the "state court fraud action"), alleging those parties actively concealed the financial condition of the AFL. Nucci also filed a Counterclaim against Kern in *Nucci v. Kern*, Adv. Pro. No. 8:11-ap-668, United States Bankruptcy Court, Middle District of Florida, Tampa Division (the "adversary proceeding fraud action"), claiming that Kern defrauded him by failing to disclose the financial condition of the

AFL.  The court in the adversary proceeding fraud action ruled that Kern materially breached the MIPA by virtue of submitting to Nucci during due diligence a balance sheet for Pigskin, which omitted the contingent liability as to the AFL's $10 million line of credit.

Defendant requests apportionment on the verdict form pursuant to *Fabré v. Marin*, 632 So.2d 1182 (Fla. 1993).

3.     As a Third Defense, the Defendant states that the Plaintiffs failed to mitigate their damages through their course of conduct in the underlying transaction, including but not limited to:  dismissing without prejudice the state court fraud action and settling their fraud claim with the Estate of Kern; continuing to pay Storm employees despite the AFL season being canceled; failing to seek recision of the contract when Plaintiffs first learned or should have learned of facts they claim had not been properly disclosed, including, but not limited to, that the AFL had drawn down a  $10 million line of credit issued to the AFL by Fifth Third Bank for operating expenses as alleged in Paragraph 45 of the Complaint; and failing to accept an offer to purchase the rights to the Storm from the bankrupt AFL for markedly less than the purchase price he negotiated with Kern.  Others may be revealed through discovery.  Therefore, any recovery should be barred or proportionately reduced as a result of this failure to mitigate.

4.     As a Fourth Defense, the Defendant states that the Plaintiffs are both equitably and judicially estopped from recovery through their own actions and course of conduct  and the court's findings and rulings on same in the matters styled:  *Pigskin v. Kern*; *Nucci v. Kern*, and *In re: Robert C. Nucci*, Case No. 8:10-bk-21419 United States Bankruptcy Court, Middle District of Florida, Tampa Division.

5.     As a Fifth Defense, this Defendant states that it is immune from any liability as it followed the directions and instructions of Plaintiffs and/or otherwise had the consent of Plaintiffs as to the scope of legal services provided.

6.     As a Sixth Defense, this Defendant states that the claims of Plaintiffs are barred in that the damages asserted are speculative and cannot be established as damages that Plaintiffs would have in fact recovered but for the alleged actions or inactions of this Defendant.

7.     As a Seventh Defense, this Defendant states that Plaintiffs exercised independent business judgment and, despite the advice of counsel, elected not to pursue available legal avenues and as such, any alleged acts of the Defendant are not the proximate cause of Plaintiffs' alleged damages.

8.     As an Eighth Defense, this Defendant states that this Defendant had no duty to provide legal services beyond the scope of the agreed upon undertaking between the parties.

9.     As a Ninth Affirmative Defense, this Defendant states the cause of action for legal malpractice is barred by the two year statute of limitations governing such claims as the cause of action accrued, if at all, more than two years prior to filing the Complaint in this action, despite the tolling agreements referenced in ¶ 60 of the Complaint.

10.    As a Tenth Defense, this Defendant states that Plaintiffs' claim for pre-judgment interest is barred as Plaintiffs failed to timely file a lawsuit thus prejudicing the Defendant to excessive and unnecessary interest.

11.    As an Eleventh Defense, this Defendant states that Plaintiffs' recovery for the First Payment paid to Kern should be capped at $700,000, which is the amount that Plaintiffs accepted in settlement for the cause of action Plaintiffs initiated against Kern to recover monies paid to Kern for the purchase of an interest in the Storm.

12.     As a Twelfth Defense, this Defendant states that any damages claimed by Plaintiff should be capped at the amounts established in Nucci's "Third Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for Robert C. Nucci", confirmed in open court by Judge Catherine Peek McEwen on October 6, 2014, including but not limited to Nucci's obligation to Regions Bank which was significantly reduced pursuant to his Bankruptcy Plan of Reorganization.

13.     As a Thirteenth Affirmative Defense, this Defendant states that it is entitled to set-off, should any damages be awarded against it, in the amount of damages or settlement amounts recovered by or on behalf of Plaintiffs from other parties or non-parties to this action.

14.     As a Fourteenth Affirmative Defense, this Defendant is entitled to set-off in the amount of $417,781.52 plus interest, which is the amount of unpaid fees and costs owed by Plaintiffs to Defendant.

15.     As a Fifteenth Affirmative Defense, this Defendant is entitled to set-off in the amount of $300,000 as Nucci paid a $300,000 non-refundable deposit to Kern before the due diligence period commenced.

16.     As a Sixteenth Affirmative Defense, this Defendant is entitled to set-off in the amount of any tax-benefit and or tax savings derived by the Plaintiffs resulting from the Storm transaction, including tax savings from off-setting Plaintiffs business gains with business losses from the Storm.

17.     As a Seventeenth Affirmative Defense, this Defendant states that Plaintiffs' injuries were the result of a superseding and intervening cause, the actions of Kern, including but not limited to his material breach of the MIPA by failing to disclose Pigskin's contingent liability

as to the AFL's $10 million line of credit, as found by Judge McEwen in the adversary proceeding.

18.     As an Eighteenth Affirmative Defense, this Defendant states that Plaintiffs' injuries were the result of a superseding and intervening cause, the negligence of Genet in his representation of Plaintiffs in their purchase of the Storm.

19.     As a Nineteenth Affirmative Defense, this Defendant states that Plaintiffs' injuries were the result of a superseding and intervening cause, the negligence of Bollenback in his representation of Plaintiffs concerning the financial aspects of their purchase of the Storm.

20.     As an Twentieth Defense, the Defendant states that the Plaintiffs are collaterally estopped from recovery by all findings and rulings made by the bankruptcy court in the adversary proceeding fraud action including but not limited to the court's finding that Kern's failure to disclose to Plaintiffs Pigskin's conditional liability to the AFL was a material breach of the MIPA.

21.     As a Twenty First Defense, this Defendant states that Plaintiffs ratified the work performed by Buchanan as they did not immediately seek rescission of the MIPA when Plaintiffs learned that the AFL had drawn down a $10 million line of credit issued by Fifth Third Bank to pay operating expenses, as alleged in Paragraph 45 of the Complaint.

22.     As a Twenty Second Defense, the Defendant states that Plaintiffs waived the right to contend Buchanan was negligent and caused them damage because they did not immediately seek rescission of the MIPA when Plaintiffs learned that the AFL had drawn down a $10 million line of credit issued to the AFL by Fifth Third Bank for the payment of operating expenses, as alleged in Paragraph 45 of the Complaint.

23.    As a Twenty Third Defense, the Defendant states that Plaintiffs do not have standing to bring this action.

24.    Defendant reserves its right to assert any additional defenses or affirmative defenses that are supported by information or facts obtained through discovery or other means during this case and expressly reserve the right to amend their Answer to assert such additional defenses or affirmative defenses in the future.

*/s/ Richards H. Ford*
Richards H. Ford, Esquire
Florida Bar No. 288391
Clay H. Coward, Esquire
Florida Bar No. 379522
Counsel for Defendant
WICKER SMITH O'HARA McCOY & FORD, P.A.
390 N. Orange Avenue, Suite 1000
Post Office Box 2753
Orlando, FL 32802-2753
PH:  407-843-3939
Fax: 407-649-8118
ORLcrtpleadings@wickersmith.com

CASE NO.:  8:15-cv-00518-EAK-AEP

<u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that on this 26th day of March, 2015, the foregoing was filed with the Clerk of Court using the CM/ECF system and will be furnished via e-mail to Adam S. Hall, Esquire, Hall, Lamb and Hall, P.A., adamhall@hlhlawfirm.com, Pleadings@hlhlawfirm.com, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

<u>/s/ Richards H. Ford</u>
Richards H. Ford, Esquire
Florida Bar No. 288391
Clay H. Coward, Esquire
Florida Bar No. 379522
Counsel for Defendant
WICKER SMITH O'HARA McCOY & FORD, P.A.
390 N. Orange Avenue, Suite 1000
Post Office Box 2753
Orlando, FL 32802-2753
PH:  407-843-3939
Fax:  407-649-8118
ORLcrtpleadings@wickersmith.com